## Chicago City Railway Company v. Nellie Casey.

### Gen. No. 13,654.

1. NEGLIGENCE—*when collision result of.  Held*, that the collision in question in this case which occurred at a railroad crossing between a traction car and a steam engine, was the result of the negligence of the traction company, that such company was bound to so run its cars at such crossings as to avoid collisions, and to take notice of the conditions of its tracks and exercise care accordingly.

2. EVIDENCE—*what testimony of medical expert competent.*  A physician who is a nerve specialist may properly be permitted to testify that his patient showed great "nervousness—tremors and quivering of her body," or apparently involuntary wincings and cries.

Action in case for personal injuries.  Appeal from the Superior Court of Cook County; the HON. THEODORE BRENTANO, Judge, presiding.  Heard in this court at the March term, 1907.  Affirmed.  Opinion filed March 19, 1908.

**Statement by the Court.**   This appeal is from a judgment of the Superior Court in favor of appellee, who was plaintiff below, against the appellant, which was defendant below.   The judgment was rendered on the verdict of a

jury in an action on the case for personal injuries. It was for $4,500.

The declaration charged that the plaintiff on August 1, 1904, was a passenger on a car of the defendant going north in Centre avenue, and that the defendant ran said street car in which the plaintiff was riding through certain lowered gates at the intersection of said Centre avenue with a steam railway track (breaking the gates), on to the steam car tracks, where the street car was struck by an approaching train and thrown from the tracks; that in consequence the plaintiff was knocked down from said street car upon her head and her body and head were bruised and injured, and she was internally hurt, suffered from hemorrhages of the mouth and ears, and was disabled in body and mind.

To this declaration the defendant pleaded not guilty.

At the close of the evidence for the plaintiff, and again at the close of all the evidence, the defendant asked for a peremptory instruction, which was denied.

After the verdict a motion for a new trial and a motion in arrest of judgment were made and overruled.

The assignments of error in this court which have been argued allege that the verdict and judgment are against the law and evidence; that the court erred in rulings on the admission and exclusion of evidence, and that improper instructions were given to the jury at the request of the appellee, and proper instructions requested by the defendant were refused.

WILLIAM J. HYNES, JOHN E. KEHOE and WATSON J. FERRY, for appellant.

C. S. O'MEARA, for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

The plaintiff on August 1, 1904, was about eleven years and a half old. She lived with her mother, who was a widow, on Justine street, in the southwestern section of Chicago, just north of Forty-ninth street. She was a school

girl, but this was vacation time. On the day in question she had been visiting a friend of her mother and of the family, who lived on Centre avenue near 53rd street. Justine street is seven blocks west of Centre avenue. The little girl, at about five o'clock in the afternoon, to go home took, on Centre avenue near 53rd street, a street car which turned east on 51st street, and rode north in that car to 51st street, where she transferred herself to another car of the defendant corporation which ran north on Centre avenue to 47th street, and then back to 53rd street. The running of this car in this way seems to have been a temporary routing arrangement, owing to changes in the tracks. The intention of the child was to transfer again on 47th street to a westbound car running by Justine street.

On boarding the car at 51st street she seated herself in the second seat from the front, on the west side of the car, facing south. When the car reached 49th street the gates of the railway crossing of the Grand Trunk Railway Company were down. The gates fell across Centre avenue on the north and south side of the railway tracks. Each gate consisted of two wooden bars, which were lowered when trains were passing or about to pass, and were raised when the crossing was clear. They were operated by a watchman or crossing-keeper, by a mechanism in a tower west of the street railway tracks, and between the two steam railway tracks.

The car on which plaintiff was riding was electrically driven by an overhead trolley wire. It did not stop before the lowered gate, but drove through it, breaking it down, and reaching the Grand Trunk track, where it was struck by an engine slowly backing toward the west. The forward trucks of the car were knocked off the track some feet to the west.

The plaintiff, according to her own testimony, was "knocked from the right side of the car" (her right side— the west side of the car) "to the left, and then knocked back to the right and out into the street," and seriously injured, as will be hereafter described.

42

Defendant's counsel in elaborate original and reply arguments insist that the above recited and undisputed facts of the collision, coupled with the evidence presented in behalf of the defendant that the car and its running and stopping appliances were in perfect condition, that there was no defect in the track, that a street sprinkler had recently passed over the street and sprinkled the tracks, and that the speed of the car was six or seven miles an hour, and that the motorman used the brake, but did not stop the car before reaching the gate, make the verdict against the company contrary to the great and clear preponderance of the evidence, and show that the occurrence was "an unavoidable accident, which the highest degree of care, caution and diligence could not have foreseen or guarded against." .

This proposition, we think, appeals more to the zeal of the advocate than to the deliberation of the judge. That a sprinkling wagon has passed over a city street should, in the last analysis, be considered a sufficient excuse as against a passenger for the defendant's running a trolley car in perfect mechanical condition, in broad daylight, through a closed grade crossing gate, and in front of a moving steam engine, is not a view of the law of carriers to which we can give assent.

We agree with the Branch Appellate Court: "We think it is the legal duty of appellant to run its trains at railway crossings in such a manner that they will not collide with each other. The slippery and greasy condition of the track on which the car was running did not change appellant's duty in this regard. It was bound to know the condition of its track and run its cars accordingly." Chicago City Railway Company v. Willard, Gen. No. 12,969, an unreported case.

We do not think that it requires the testimony of the flagman, Smith, viewed with so much suspicion by defendant's counsel, to the effect that the motorman's attention was distracted to women on the sidewalk as the car approached the gates, to establish a case which renders the defendant liable for any injury to the plaintiff which resulted from this collision. But if that evidence was so necessary, we should

not be disposed to treat it as cavalierly as the defendant would have us.    The testimony of Mr. Smith certainly reads somewhat confusedly and obscurely (he is said to have understood English only imperfectly), but we see no signs of its being wilfully false, nor indeed anywhere in this case the slightest indication of its being brought on a fraudulent or trumped up claim.    As the trial judge very properly said, "Smith may have seen the accident, and yet be unable to describe it intelligently"; and again, "Isn't his evidence to be weighed by the jury?    Of course we had the man on the stand here, we could see what sort of a man he was."

Defendant, however, argues that if it is liable for the results of the accident, the weight of the evidence is that the plaintiff received no injury—or at least none such as she claimed she received.    It would be useless for us to summarize the evidence on this point, for there is nothing whatever that is of any material importance to contradict her own story, that she was thrown out of the car, that she was bruised and in pain that night, that she remained in bed for a fortnight after that time, that since then she has had for years neurotic pains and hemorrhages, which she never had before, that she was much frightened, and that she was attended by Dr. Kirby, the surgeon of the Grand Trunk Road, and examined afterwards by a very eminent neurologist, Dr. Patrick.

Nor is there any evidence to contradict her mother, whose testimony tended to show a very grave nervous shock to the girl, besides the visible injuries from the accident, and that from a healthy and robust child she had become one of frail and delicate health.

The negative testimony of people who did not see her thrown to the ground, and the fact that she was able to walk or run home from the scene of the accident, furnish no such contradiction.

On the other hand, there are many unimpeached lay witnesses who swear that the plaintiff's own testimony and that of her mother in relation to her relative condition of health before and after the accident, were true, while it seems quite

evident from the medical testimony offered on behalf of the plaintiff, that the plaintiff suffered from the accident a concussion of the brain and a great fright, producing minor epilepsy, which predisposes to major epilepsy. We do not think the medical evidence on the part of the defendant would necessarily have caused a jury of reasonable men to repudiate this conclusion, and we do not think that the objections which are made to the medical evidence for the plaintiff are well taken. It is not necessary to discuss and analyze the rules laid down in various cases in Illinois about the admissibility of medical opinions based in whole or in part on "self-serving physical demonstrations," because the testimony of Dr. Kirby and Dr. Patrick, both of whom swore they did not examine for the purpose of testifying, is based not on any such things, but on what as physicians in the reasonable discharge of their duties they could see and learn. A physician who is a nerve specialist surely is not prevented by any rule of law from testifying that his patient showed great "nervousness—tremors and quivering of her body," or apparently involuntary wincings and cries. A rigorous rule was applied to Dr. Patrick when he was told that he must exclude everything learned from the patient.

There is no reversible error in the rulings on evidence or in the instructions. The case was not a close one, in our opinion. The damages do not seem to us excessive, and the judgment of the Superior Court is affirmed.

*Affirmed.*